## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

| | |
|---|---|
| DRAMA M. CECIL, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| v. | )     CIVIL ACTION NO. 1:05-0446 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|       Defendant. | ) |

### <u>MEMORANDUM OPINION</u>

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Disabled Widow's Benefits (DWB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case was referred to the undersigned United States Magistrate Judge by Standing Order to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are cross-Motions for Judgment on the Pleadings. (Doc. Nos. 12, 15.) Both parties have consented in writing to a decision by the United States Magistrate Judge.

The Plaintiff, Drama M. Cecil (hereinafter referred to as "Claimant"), filed applications for DIB and DWB on February 18, 2000, alleging disability as of May 4, 1999, due to epilepsy, nerves, seizures, and pain in her back, neck, and joints.[1] (Tr. at 26, 176-78, 241, 560-61.) The claims were denied initially and upon reconsideration. (Tr. at 563-65, 569-71.) On September 19, 2000, Claimant

---

[1] Claimant filed prior applications for benefits on June 14, 1999. (Tr. at 173-75, 551-53.) The claims were denied initially, and Plaintiff did not file a timely appeal of that denial. (Tr. at 89-96, 111, 554-59.)

requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 107.) The hearing was held on August 9, 2001, before the Honorable Steven A. De Monbreum. (Tr. at 583-622.) By decision dated September 26, 2001, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 75-84.) Following receipt of the ALJ's decision, Claimant filed new applications for benefits, submitted additional evidence, and requested Appeals Council review of ALJ De Monbreum's decision. (Tr. at 269-78.) Claimant was awarded benefits on her new applications as of September 27, 2001. (Tr. at 273.) By Order dated October 9, 2002, the Appeals Council remanded ALJ De Monbreum's decision for consideration of the evidence submitted with the request for review concerning Claimant's mental impairments. (Tr. at 132-34.)

A second hearing was held on September 16, 2003, before ALJ De Monbreum.[2] (Tr. at 639-72.) Claimant and Dr. Arthur C. Ballas, M.D., an independent medical expert, appeared and testified at the hearing. (Id.) By decision dated November 28, 2003, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 22-40.) The ALJ's decision became the final decision of the Commissioner on May 17, 2005, when the Appeals Council denied Claimant's request for review.  (Tr. at 11-14.) On May 27, 2005, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

To be entitled to DWB, a claimant must establish, among other things, that she is the widow of a fully insured wage earner, that she is unmarried, that she is at least 50 years old but not yet 60 years old, and that she is under a disability that began no later than 7 years after the wage earner's death or 7 years after she was last entitled to Survivor's Benefits. 42 U.S.C. § 402(e)(1); 20 C.F.R. § 404.335 (2004). Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a

---

[2] A hearing was initially scheduled on January 14, 2003, but due to the medical expert's non-receipt of all the medical evidence, testimony was not taken. (Tr. at 23, 623-38.)

disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 404.1520(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2004). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow

3

a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and

416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings

to determine whether the claimant has a medically determinable mental impairment and documents

its findings if the claimant is determined to have such an impairment. Second, the SSA rates and

documents the degree of functional limitation resulting from the impairment according to criteria as

specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional
> limitations is a complex and highly individualized process that requires us to consider
> multiple issues and all relevant evidence to obtain a longitudinal picture of your overall
> degree of functional limitation. We will consider all relevant and available clinical
> signs and laboratory findings, the effects of your symptoms, and how your functioning
> may be affected by factors including, but not limited to, chronic mental disorders,
> structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to
> which your impairment(s) interferes with your ability to function independently,
> appropriately, effectively, and on a sustained basis. Thus, we will consider such factors
> as the quality and level of your overall functional performance, any episodic
> limitations, the amount of supervision or assistance you require, and the settings in
> which you are able to function. See 12.00C through 12.00H of the Listing of
> Impairments in appendix 1 to this subpart for more information about the factors we
> consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the
> degree of your functional limitation: Activities of daily living; social functioning;
> concentration, persistence, or pace; and episodes of decompensation. See 12.00C of
> the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas
> (activities of daily living, social functioning; and concentration, persistence, or pace),
> we will use the following five-point scale: None, mild, moderate, marked, and extreme.
> When we rate the degree of limitation in the fourth functional area (episodes of
> decompensation), we will use the following four-point scale: None, one or two, three,
> four or more. The last point on each scale represents a degree of limitation that is
> incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA

determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of

daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth

4

(episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant met all of the nondisability requirements for DIB and DWB. (Tr. at 26, 38 at Finding Nos. 1-2.) He found that Claimant satisfied the first inquiry under the sequential evaluation because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 27, 38 at Finding No. 3.) Under the second inquiry, the ALJ found that Claimant suffered from back sprains with degenerative disc disease and a history of seizure disorder, which the ALJ found were severe impairments. (Tr. at 31, 39 at Finding 4.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 31, 39 at Finding 5.) The ALJ then found that Claimant had a residual functional capacity for a significant range of medium work as follows:

> [T]he claimant is able to frequently lift and carry 25 pounds (with occasional lifting/carrying of 50 pounds) and sit, stand, or walk as required throughout an 8-hour work day. In addition, her history of a seizure disorder rules out more than occasional climbing of ladders, ropes, or scaffolds, as well as concentrated exposure hazards such as unprotected heights or moving machinery.

(Tr. at 33-34, 39 at Finding 8.) At step four, the ALJ found that during the relevant period, from May 4, 1999, through September 26, 2001, Claimant was able to return to her past relevant work. (Tr. at 37, 39 at Finding 9.) Alternatively, the ALJ further found, on the basis of Medical Expert and Vocational Expert ("VE") testimony, that Claimant could perform jobs such as hand packer, stocker, laundry worker, packager, and ticket taker, which existed in significant numbers in the national economy. (Tr. at 38, 39 at Finding 13.) On these bases, benefits were denied. (Tr. at 38-39.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined

6

as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals that the decision of the Commissioner in this case is supported by substantial evidence.

Claimant's Background

Claimant was born on February 26, 1949, and was 54 years old at the time of the second administrative hearing. (Tr. at 26, 176, 588.) Claimant completed the tenth grade and has a General Equivalency Diploma. (Tr. at 26, 247, 589.) Claimant has an associate's degree from the National Business College. (Tr. at 590.) In the past, she worked as a fast food worker, officer cleaner, and convenience store clerk. (Tr. at 26, 590-94, 619.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in not finding that Claimant had a disabling musculoskeletal impairment and a disabling mental impairment. (Pl.'s Br. at 5-23.) The Commissioner asserts that these arguments are without merit. (Def.'s Br. at 14-20.)

1. <u>Musculoskeletal Impairment</u>.

Claimant first argues that the ALJ erred in not finding that she had a disabling musculoskeletal impairment. (Pl.'s Br. at 6-12.) Claimant argues that the ALJ's analysis of her musculoskeletal impairments in his first decision was wrong, and that it was error for him to revisit his earlier decision after new evidence was submitted. (<u>Id.</u> at 8.) In so arguing, Claimant essentially challenges the ALJ's decision to accord little weight to the opinion of Dr. Robert P. Kropac, M.D., Claimant's treating orthopedist, and the ALJ's residual functional capacity ("RFC") assessment. The Commissioner asserts that although Claimant had "some diagnostic findings to support a back impairment, her physical examinations have remained virtually normal, with documentation of no persistent abnormalities other than tenderness and a slight reduction in range of motion." (Def.'s Br. at 15.) The Commissioner further asserts that the ALJ's decision is supported by the opinions of the two reviewing State agency physicians, whose opinions are supported by evidence of record. (Tr. at 16.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. <u>See</u> 20 C.F.R. § 404.1527(d)(2) (2004). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. § 404.1527(d)(2) (2004). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 404.1527(d)(2) (2004). Social Security Ruling ("SSR") 96-2p, 1996 WL 374188 (S.S.A.), reiterates the standard for considering medical opinions of treating sources stating when the ALJ must adopt the opinions of treating sources on the issue(s) of the nature and severity of claimants' impairments as

8

follows:

> The [regulatory] provision recognizes the deference to which a treating source's medical opinion should be entitled. It does not permit us to substitute our own judgment for the opinion of a treating source on the issue(s) of the nature and severity of an impairment when the treating source has offered a medical opinion that is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.

According to SSR 96-2p, the medical opinions of treating sources must be given controlling weight when they meet four factors: (1) they must be opinions of "treating sources"; (2) they must be "medical opinions", i.e., opinions about the nature and severity of claimants' impairments; (3) the ALJ must find them "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques; and (4) even if well-supported, the opinions must be "not inconsistent" with the other "substantial evidence" in the individual's case record. SSR 96-2p states further as follows:

> It is not unusual for a single treating source to provide medical opinions about several issues; for example, at least one diagnosis, a prognosis, and an opinion about what the individual can still do. Although it is not necessary in every case to evaluate each treating source medical opinion separately, adjudicators must always be aware that one or more of the opinions may be controlling while others may not.

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(d)(2).

Generally speaking with respect to medical opinions, the ALJ gives more weight to opinions of treating physicians than to those of examining and non-examining physicians. 20 C.F.R. § 404.1527.

As between the opinions of examining and non-examining physicians, the ALJ will generally give more weight to the opinion of examining physicians. 20 C.F.R. § 404.1527(d)(1). Opinions of medical experts are accorded the same treatment as that given non-examining sources. 20 C.F.R. § 1527(f)(2)(iii).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2) (2004).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted). Although medical source opinions are considered in evaluating an individual's residual functional capacity, the final responsibility for determining a claimant's RFC is reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(2) (2004). In determining disability, the ALJ must consider the medical source opinions "together with the rest of the relevant evidence we receive." Id. § 404.1527(b).

The record indicates that Claimant sought treatment from Dr. Kropac from March 7, 2000, through October 31, 2002. (Tr. at 436-43, 463, 464-71, 520-29.) On March 7, 2000, Claimant was examined by Dr. Kropac for an orthopedic consultation and evaluation. (Tr. at 440-43.) She complained of low back pain, which had increased in intensity since November 1999. (Tr. at 440.) The pain was increased with bending, stooping, or twisting but was not particularly increased with standing or sitting. (Id.) On examination, Dr. Kropac noted in regard to Claimant's cervical spine that she had no tenderness to palpation, that there was no significant scoliosis, and that she had a full range of cervical motion with pain at the extremes. (Tr. at 441.) Claimant presented with tenderness to palpation

over her lower spine with slightly limited range of lumbosacral spine motion. (Tr. at 442.) However, she had normal strength, ranges of motions, reflexes, and sensation of both upper and lower extremities. (Tr. at 441-42.) Claimant was able to heel and toe walk without weakness and her gait was not antalgic in nature. (Tr. at 442.) X-rays of her cervical and lumbosacral spine suggested degenerative changes. (Tr. at 443.) Dr. Kropac diagnosed cervical/dorsal musculoligamentous strain and lumbosacral musculoligamentous strain superimposed on degenerative changes. (Id.) Her treatment consistent of only medications. (Id.)

Claimant was re-examined by Dr. Kropac on April 2, and July 14, 2000. (Tr. at 436-37, 438-39.) Claimant reported that she continued to experience low back pain and, at times, pain in her lower extremity and neck. (Tr. at 436, 438.) On her first follow up visit, Claimant reported that the medication had been quite helpful. (Tr. at 438.) On examination, Claimant had some tenderness and limitation of motion of the cervical and lumbosacral spine, with tenderness extending into the right buttock. (Tr. at 436, 438.) Dr. Kropac's neurological exams of Claimant's lower extremities remained objectively normal. (Id.) He continued his diagnoses and prescription medication treatment. (Tr. at 436-39.)

In a letter to Claimant's counsel dated March 28, 2001, Dr. Kropac opined that based on his findings and Claimant's "residual capacity as a result of her impairments, and in light of her age, education, and work experiences, [Claimant] is considered to be permanently totally disabled from gainful employment." (Tr. at 463.)

Following the Appeals Council's Order of remand, Claimant's counsel submitted updated progress notes from Dr. Kropac from October 11, 2000, through October 31, 2002. (Tr. at 464-71, 520-29.) During the re-examinations between October 11, 2000, and July 10, 2001, Claimant continued to complain of low back pain with radiating pain in the right extremity, as well as pain in her neck,

shoulders, and left arm. (Tr. at 464, 466, 468, 470.)  On examination, Dr. Kropac noted that she had tenderness and limitation of range of cervical and lumbosacral motion. (Id.) Claimant's neurological exams were otherwise normal. (Id.) On October 18, 2000, an MRI Scan of Claimant's cervical spine revealed mild dextroscoliosis with minimal left C-6 foraminal encroachment and mild degenerative disc disease. (Tr. at 461.) The MRI Scan of her lumbar spine revealed mild disc bulging at levels L2-3, L4-5, and L5-S1 and an 8 millimeter disc fragment at T12-L1. (Tr. at 462.) Dr. Kropac diagnosed cervical/dorsal musculoligamentous strain superimposed on degenerative disc disease and lumbar disc herniation with right lower extremity radiculitis. (Tr. at 464, 466, 468, 470.) He continued to treat Claimant with medication. (Tr. at 464, 466, 469, 470.) On July 10, 2001, Dr. Kropac recommended that Claimant use a TENS unit at home for four months. (Tr. at 464.)

From December 18, 2001, through October 31, 2002, Claimant complained of constant neck pain which was increased with motion of the head and neck and use of her upper extremities. (Tr. at 520, 522, 524, 526, 528.) She also reported that she continued to experience constant low back pain which was increased with bending, stooping, and prolonged sitting and standing, and pain in her right lower extremity which was increased with prolonged sitting and standing. (Id.) On examination, Dr. Kropac noted that she had tenderness of the cervical and lumbosacral spine with limitation of motion. (Id.) Straight leg raising on the right precipitated low back pain on the right side while in the sitting position. (Id.) Otherwise, her neurological examinations were normal. (Id.) Dr. Kropac continued the prior diagnoses and continued her treatment on medication. (Tr. at 521, 523, 525, 527.)  However, based on an EMG Study and Claimant's complaints of recurrent numbness in her right hand, Dr. Kropac diagnosed on July 16, 2002, carpal tunnel syndrome ("CTS"), which was worse on the right side than the left. (Tr. at 526-27, 528-29.) He referred Claimant to Dr. Morgan for surgical decompression of her right median nerve and right wrist and hand. (Tr. at 527.) On October 31, 2002,

however, Dr. Kropac noted that Claimant "does not wish to have any surgical intervention with regard to her carpal tunnel syndrome at this time." (Tr. at 529.)

The ALJ summarized the medical evidence and noted Dr. Kropac's treatment of Claimant and his opinion that Claimant was disabled but accorded the opinion little weight. (Tr. at 36.) In according little weight to Dr. Kropac's opinion, the ALJ analyzed and weighed all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(d)(2)-(6). (Tr. at 35-36.) The ALJ found that although Claimant had some tenderness and reduced limitations of her cervical and lumbosacral spine due to her musculoskeletal impairment, her neurological examinations were normal and Dr. Kropac's treatment consisted of only prescription medication. (Tr. at 36.) Thus, the ALJ found that Dr. Kropac's opinion was not consistent with the medical evidence as a whole. Asserting nine separate errors, Claimant argues that the ALJ "arbitrarily adopted his original analysis," and therefore, did not properly evaluate Claimant's musculoskeletal impairment. (Pl.'s Br. at 8-12.)

The Court finds that although the ALJ referenced his first decision with regard to Claimant's musculoskeletal impairments, the ALJ considered on remand Dr. Kropac's updated medical records in finding that Claimant's condition did not prevent her from working. (Tr. at 29-30, 34-36.) The updated records reflected similar complaints of pain and continued treatment with prescription medication. The ALJ properly considered as one factor in his decision that Claimant's condition required only treatment by medication, as opposed to physical therapy or surgical intervention. (Tr. at 35-36.) The Court notes that Claimant also used a TENS unit at home. (Tr. at 464, 493.) The ALJ acknowledged that Claimant experienced pain, tenderness, and reduced ranges of cervical and lumbosacral motion, but noted that the objective medical evidence did not support a finding of disability; her neurological exams were normal and diagnostic studies revealed only mild degenerative disc disease and minimal bulging. (Tr. at 35-36.) The neurological findings were consistent with the

findings of Dr. William Merva, M.D., who noted on June 14, 2000, and January 10, 2001, that she had negative straight leg raising and normal deep tendon reflexes, strength, and sensation. (Tr. at 30, 483-84.) The ALJ considered Dr. Kropac's opinion that Claimant was totally disabled, but found that the opinion was not supported by the evidence of record. (Tr. at 36.) <u>See</u> 20 C.F.R. § 404.1527(e)(1)-(3); 416.927(e)(1)-(3) (2004) (stating that a statement by a medical source that you are "disabled" or "unable to work" is an opinion on an issue reserved to the Commissioner, the source of which is not entitled to any special significance). Thus, Dr. Kropac's opinion that Claimant was totally disabled was not supported by his treatment records, which revealed normal neurological findings and treatment by prescription medication, or by other medical evidence of record. With the exception of some decreased range of motion, Dr. Kropac does not discuss any limitations caused by Claimant's musculoskeletal impairment.

The ALJ found that the opinions of the two reviewing state agency physicians, however, more accurately reflected the severity of Claimant's impairment. <u>See</u> 20 C.F.R. § 404.1527(f)(2)(I) ("State agency medical . . . consultants . . . are highly qualified physicians . . . who are also experts in Social Security disability evaluation.") These physicians noted Claimant's condition and found that she was able to lift/carry 50 pounds occasionally and 25 pounds frequently; was able to stand, walk, and sit six hours out of an eight-hour workday; and that her ability to push or pull was unlimited. (Tr. at 429, 433, 445, 449.) These physicians further opined that Claimant's ability to balance, stoop, kneel, crouch, and crawl was frequently limited and that her ability to climb was occasionally limited. (Tr. at 430, 446.) The ALJ thus accorded the state agency physicians' opinions great weight.

With regard to Claimant's CTS, the medical evidence of record indicates that she was diagnosed with mild CTS in January 1990, based on sensory exams. (Tr. at 316.) However, during the period of time at issue, from May 4, 1999, through September 26, 2001, there was no evidence of

limitation resulting from her CTS. Dr. Kropac did not address Claimant's CTS until June 2002, after the relevant period, when he ordered an EMG study based on Claimant's complaints of pain and numbness in her right hand. (Tr. at 524-25, 526.) The EMG revealed moderate CTS and he referred her for a surgical evaluation. (Tr. at 527.) Clamant however, did not consider the condition severe enough to warrant surgical intervention. (Tr. at 529.) Accordingly, the Court finds that the ALJ's findings with regard to Claimant's CTS were supported by substantial evidence of record.

The ALJ determined, based upon all the evidence of record, that Claimant was capable of performing the demands of medium work. (Tr. at 33-34, 39.) The Court finds that the ALJ's conclusion that Dr. Kropac's opinion was not supported by his treatment notes and other medical evidence of record is supported by substantial evidence. The Court notes that the ultimate finding of disability was an issue reserved to the ALJ. See 20 C.F.R. § 404.1527(e)(2) (2004). Accordingly, the Court further finds the ALJ's analysis of the medical evidence proper and in accordance with the applicable law and Regulations, and finds that the determination is supported by substantial evidence.

2. Mental Impairment.

Claimant also argues that the ALJ erred in not finding that she suffered from a severe, disabling mental impairment. (Pl.'s Br. at 12-23.) Claimant argues that the ALJ's analysis is "sophistry" and that he erred in focusing on the relevant period of time rather than extrapolating the medical evidence submitted after his first decision backward. (Id. at 15-23.) She asserts that the ALJ mischaracterized the medical expert's testimony. (Id.) Citing Reed v. Bowen, 1987 WL 39024 (4th Cir. (W.Va.) Nov. 10, 1987), an unpublished opinion, Claimant further argues that the ALJ improperly relied upon the absence of mental evidence from Dr. Merva's treatment notes in finding that she did not suffer from a severe mental impairment during the relevant period of time. (Id. at 18-19.) The Commissioner asserts that the ALJ's decision was logical and supported by substantial evidence. (Def.'s Br. at 17-20.)

15

With regard to Dr. Ballas' testimony, the Commissioner asserts that although he initially indicated that Claimant met the listing for depression, "further questioning made it clear that he could not identify the evidence needed to meet the specific criteria of that listing." (Id. at 17.) Furthermore, although Claimant was prescribed medication for anxiety and depression before the alleged period of disability, the Commissioner argues that there is no evidence suggesting a significant deterioration in her mental condition until September 27, 2001. (Id. at 18.) Thus, the Commissioner asserts that the ALJ's decision is supported by substantial evidence. (Id.)

To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe. 20 C.F.R. §§ 404.1520(c) (2004). Under current law, a severe impairment is one "which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) (2004); see also 20 C.F.R. §§ 404.1521(a) (2004); Bowen v. Yuckert, 482 U.S. at 140-41, 107 S.Ct. at 2291 (recognizing change in severity standard). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b) (2004). Examples of basic work activities under those sections are:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations;  and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b) (2004).

In his first decision, the ALJ found that while Claimant alleged depression as a disabling condition, there was no evidence that she sought treatment from a mental health professional. (Tr. at 78.) The State agency medical consultant, Debra L. Lilly, M.D., noted Claimant's allegations of

16

nervous problems and depression, but opined that her affective disorder was not a severe impairment because the conditions had not required inpatient hospitalization or formal outpatient mental health treatment, and there were no resulting psychological limitations. (Tr. at 452-53.) Dr. Lilly further opined that she experienced only slight limitations in activities of daily living, social functioning, and concentration, persistence, or pace, with no episodes of decompensation. (Tr. at 459.) Dr. Lilly did not identify the medical records she reviewed in formulating her opinion. However, based on this opinion and the lack of mental health treatment evidence, the ALJ found that Claimant's mental conditions were non-severe impairments. (Tr. at 32-34.) He further found that Claimant's social functioning and activities of daily living were "no more than slightly restricted," that she seldom had deficiencies in concentration, and that she had never decompensated in a work-like setting. (Tr. at 78-79.)

Following the ALJ's decision, Claimant's counsel sent her to William Steinhoff, a psychologist, for a mental evaluation. (Tr. at 22, 472-82.) In his report dated October 30, 2001, Mr. Steinhoff diagnosed major depressive disorder, recurrent, severe with psychotic features and panic disorder without agoraphobia. (Tr. at 22, 477.) His diagnoses were based in part on Claimant's reports that her depression had worsened since her husband's death in May 1999, and that she nightly talked to her deceased husband and that he talked back to her. (Tr. at 472.) She further reported that she experienced crying spells at night, decreased energy and appetite, and increased heart rate, shortness of breath, and dizziness. (Id.) Claimant also advised Mr. Steinhoff that she sought treatment through Southern Highlands Community Mental Health Center ("Southern Highlands") where she returned for treatment in October 2001. (Tr. at 473.) Mr. Steinhoff opined that Claimant's ability to sustain concentration and persistence in completing tasks was significantly impaired and that her pace was significantly slow. (Tr. at 478.) He noted that she had a low energy level, depressed mood, fatigue, drowsiness, and panic attacks. (Id.) He thus opined that her prognosis was poor and that "[s]he is likely

to have difficulty sustaining gainful employment in any type of reliable manner due to severe symptoms of depression as well as her panic attacks and symptoms of psychosis." (Tr. at 477-78.)

By Order dated October 9, 2002, the Appeals Council noted that Claimant was taking Paxil, as prescribed by Dr. Kropac, and Zoloft for anxiety as prescribed by Dr. Merva. (Tr. at 132.) The Appeals Council further noted the new diagnoses from Mr. Steinhoff, and thus, remanded the case for further consideration "in assessing [Claimant's] residual functional capacity and the severity of her impairments." (Id.)

On remand, the ALJ requested Claimant's mental health records from Southern Highlands, Dr. Bizri, and Dr. Merva, and obtained the services of an independent medical expert psychologist, Dr. Arthur C. Ballas, M.D. (Tr. at 32, 643-71.) Claimant submitted updated treatment records from Dr. Merva, Dr. Kropac, and Bluestone Health Center ("Bluestone"). Despite Claimant's reports to Mr. Steinhoff that she was seeking mental health treatment, the Southern Highlands records revealed that she did not seek treatment there until November 10, 2001, and that treatment consisted of only four sessions for her depression, anxiety, and panic attacks. (Tr. at 535.) Claimant reported having problems with anxiety attacks and her nerves since she was twelve years old and a loss of interest and depression since her husband's death in May 1999. (Id.) She further reported that she hears her deceased husband's voice at bedtime telling her that he loves her and that he holds her in his arms. (Tr. at 536.) A psychiatric evaluation was ordered and was conducted by Dr. Ghassan Bizri, M.D., on January 9, 2002.

Dr. Bizri's mental status exam revealed normal psychomotor activity, fluctuating moods, and a tearful, depressed affect. (Tr. at 541.) He noted audiovisual hallucinations based on Claimant's reports that she saw and heard her deceased husband. (Id.) Dr. Bizri further noted that Claimant was alert and oriented, displayed good attention, and had good insight and judgment. (Id.) He diagnosed

18

major depressive disorder, recurrent, severe, with psychotic features, noted that she had grief issues, and was undergoing conflicts with her children and finances. (Id.) He noted that her prognosis was good. (Id.) Dr. Bizri increased her Zoloft from 100 mg. to 150 mg., and added prescriptions for Remeron to help her sleep, and Zyprexa. (Id.) Follow-up sessions in February and March 2002, indicated that Claimant was sleeping better, had an improved appetite, and had increased energy. (Tr. at 542-43.)

At the administrative hearing, Dr. Ballas initially testified that during the relevant period, Claimant suffered from a mood disorder with mixed anxiety and depression, which met Listing 12.04. (Tr. at 648-50, 652.) Upon questioning by the ALJ, however, Dr. Ballas was unable to identify the evidence required to meet all the criteria of Listing 12.04. (Tr. at 652-58.) Furthermore, the evidence upon which Dr. Ballas relied was generated after the period at issue, and the ALJ found that it did not relate back to the period at issue. (Id.) Specifically, Dr. Ballas relied upon the medical reports of Mr. Steinhoff and Dr. Bizri. (Id.) Claimant testified, however, that she "almost had a nervous breakdown" after receiving the ALJ's September 26, 2001, decision, and upon the anniversary of her marriage, which precipitated her seeking treatment at Southern Highlands in November 2001. (Tr. at 659-60.) Dr. Ballas in turn testified that it was plausible that Claimant's condition had deteriorated after receiving the ALJ's decision and at the time of her anniversary thereby rendering her condition poorly upon exam by Mr. Steinhoff and Southern Highlands. (Tr. at 664.) Dr. Ballas opined that the four counseling sessions she received at Southern Highlands could have ameliorated her particular condition. (Tr. at 665.) He further testified that Claimant's GAF scores of 51 and 55 never indicated more than moderate limitations during the relevant period at issue. (Tr. at 657.)

The ALJ concluded that Claimant did not have a severe mental impairment during the relevant period at issue. (Tr. at 32.) Rather, the ALJ found that Claimant underwent her first period of

19

decompensation after receiving his September 27, 2001, decision which was near the time of her

wedding anniversary. (Id.) The Court finds that the ALJ's decision is supported by substantial

evidence. By Claimant's admission, she sought treatment from Southern Highlands only after she

nearly had a nervous breakdown upon receipt of the ALJ's September 27, 2001, decision. (Tr. at 647,

660.) Other than a few visits to Bluestone, Claimant had not sought any mental health treatment and

her evaluation by Mr. Steinhoff was orchestrated by her counsel. (Tr. at 472.) Moreover, although Dr.

Kropac and Dr. Merva prescribed medications for depression and anxiety, there is no evidence that

her mental condition deteriorated or was severe until after her first episode of decompensation. Dr.

Merva's treatment notes prior to and immediately after the relevant period at issue reflect that on

examination, Claimant's memory was intact and that she was alert and oriented, was able to repeat

expressions, and was able to follow complex commands. (Tr. at 309.) In 1995, Dr. Merva prescribed

Zoloft upon Claimant's request for something for her nerves after learning that her husband had

cancer. (Tr. at 305.) On March 11, 1997, Dr. Merva reported that Claimant went off Zoloft for four

months and started taking Paxil. (Tr. at 303.) On January 10, 2001, Dr. Merva again reported that

Claimant's memory was intact, that she was alert and oriented, and that she was able to follow

complex commands and repeat expressions. (Tr. at 483.) Nevertheless, Dr. Merva increased Claimant's

prescription for Zoloft to control her anxiety. (Id.) The increase in medication correlates with the

ALJ's finding that Claimant underwent a period of decompensation after receiving his first decision.

The Court notes that treatment notes from Bluestone reflect that Claimant's anxiety and

depression were "controlled with Paxil 20 mg." (Tr. at 388.) On several occasions she presented at

Bluestone with a rash which she attributed to her nerves but which the medical evidence suggests was

associated with either her nerves or was a reaction to medication. (Tr. at 391, 398, 485.) Otherwise,

there is no indication from Claimant's treating physicians' records that she suffered a severe mental

impairment or suffered any limitations from her mental condition. While Claimant relies on the holding in Reed v. Bowen for the proposition that expert psychiatric testimony cannot be rebutted by the absence of evidence regarding a claimant's mental condition in contemporaneous reports from a treating neurosurgeon, the evidence in the instant case is not the same as that in Reed. Here, the only evidence that establishes any mental impairment during the relevant period at issue consists of progress notes from her treating neurologist, Dr. Merva, and a few scant notes from Bluestone. Other than two visits to Bluestone, Claimant did not seek mental health treatment during the relevant period of time. Accordingly, the ALJ properly considered as one factor, the absence of mental health treatment records during the relevant period, in finding that she did not suffer from a severe mental impairment.

The Court also notes that Claimant continued to work through February 2000, albeit her employment during the relevant period at issue (from October 1999, through February 2000), was part-time, based in part on employer restrictions and in part on Claimant's allegations that her impairments prevented her from working. (Tr. at 76, 207, 236-39.)

The Court finds that the ALJ's conclusion is consistent with Dr. Lilly's assessment that although Claimant was depressed during the relevant period at issue, her depression was not severe and did not prevent her from working. Claimant argues that the extent of her mental impairment was not obvious until after the psychological evaluations by Mr. Steinhoff and Dr. Bizri (Pl.'s Br. at 22.), but the medical records of Mr. Steinhoff, Dr. Bizri, and Southern Highlands, do not refute Dr. Lilly's opinion or suggest that there was a deterioration in Claimant's mental condition prior to September 27, 2001.

The Court further finds that despite Claimant's arguments to the contrary, Dr. Ballas' testimony supports the ALJ's findings. Although Dr. Ballas initially opined that Claimant met the criteria for Listing 12.04, upon further inquiry by the ALJ, it was revealed that Dr. Ballas' findings were based

21

in large part on Claimant's self-reports to Mr. Steinhoff and to Southern Highlands. Dr. Ballas later acknowledged, however, that Claimant's condition could have worsened when she was examined by Mr. Steinhoff, after receipt of the ALJ's first decision and near the time of her wedding anniversary. Thus, Dr. Ballas' testimony suggests that he changed his opinion throughout the course of the hearing. Nevertheless, even had Dr. Ballas opined that Claimant had a severe mental impairment, he testified that based on the evidence of record, he was unable to identify any functional limitations therefrom. Based on the foregoing, the Court finds that the ALJ's conclusion that Claimant suffered a period of decompensation after receiving his earlier decision and upon the anniversary of her marriage to her deceased husband, and that her mental condition was not severe prior to September 27, 2001, is supported by substantial evidence of record. Furthermore, the ALJ made a proper determination of Claimant's functional capacity in accordance with the applicable law and Regulations. Accordingly, Claimant's argument is without merit.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order previously entered, the Plaintiff's Motion for Judgment on the Pleadings is **DENIED**, Defendant's Motion for Judgment on the Pleadings is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk is requested to send a copy of this Memorandum Opinion to counsel of record.

ENTER: October 18, 2006.


R. Clarke VanDervort
United States Magistrate Judge

22